# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

TWEET/GAROT-AUGUST WINTER, LLC,

        Plaintiff,

    v.                                    Case No. 06-C-800

LIBERTY MUTUAL FIRE INSURANCE
COMPANY,

        Defendant.

## MEMORANDUM AND ORDER GRANTING MOTION FOR DECLARATORY AND SUMMARY JUDGMENT

This diversity action arises out of a dispute between Plaintiff Tweet/Garot-August Winter, LLC ("Tweet/Garot") and its insurer, Defendant Liberty Mutual Fire Insurance Company ("Liberty Mutual") over insurance coverage for the cost of removal and replacement of defective valves that Tweet/Garot installed in the HVAC system at Lambeau Field in Green Bay. Tweet/Garot claims that Liberty Mutual's policy provides coverage for Tweet/Garot's removal and replacement costs, and that, in any event, Liberty Mutual is estopped from denying coverage on the basis of its initial acceptance of coverage and its appearance in a separate state court action against the valve suppliers. Liberty Mutual has moved for declaratory judgment that its policy does not cover the insurance claims Tweet/Garot submitted, and for summary judgment on all of Tweet/Garot's claims. For the reasons that follow, Liberty Mutual's motion will be granted.

## I.  BACKGROUND

Tweet/Garot-August Winter is a Wisconsin limited liability company that was formed by its namesake members (Tweet/Garot Mechanical, Inc. and August Winter & Sons, Inc.) in order to

bid on the plumbing and HVAC work of the Lambeau Field Redevelopment Project.[1]  Begun in the

late 1990s, this project expanded and refurbished Lambeau Field, the stadium of the Green Bay

Packers.  Tweet/Garot[2] won the contract to install pipes and valves in the heating and cooling

systems for the stadium's indoor sections.  The pipes carry a propylene glycol solution.  In the first

half of 2004 the Lambeau Field maintenance staff discovered that some of the installed valves

leaked and otherwise failed to stop the flow of the solution, which caused damage to stadium

property such as carpet, couches, seats, and drywall.  In the summer of 2004, Tweet/Garot removed

and replaced 13 of the valves, sent some of the removed valves to a laboratory for testing, and

notified the valves' manufacturer, seller, and marketing company of the failure.  The testing

laboratory concluded the interior of the valves had been improperly coated, and that each of the

remaining valves was defective.  The Green Bay Packers and the general contractor of the

redevelopment project ordered Tweet/Garot to replace the remaining 300-plus valves even though

none of them had leaked or caused damage.  However, in order not to disrupt the 2004 football

season, Tweet/Garot waited to complete the replacement and repair work until after the 2004

football season concluded.  Because many of the valves were behind walls or in other difficult-to-

---

[1]Tweet-Garrot and August Winters are both citizens of the State of Wisconsin since they are
both Wisconsin corporations that are locally based in the Green Bay area.  (Compl. ¶ 1; Pl.'s PFOF
¶ 8.)  This finding supports the parties' general allegation that the LLC is a citizen of the State of
Wisconsin for diversity purposes.  *See Belleville Catering Co. v. Champaign Market Place, L.L.C.*,
350 F.3d 691, 692 (7th Cir.2003) ("In common with other courts of appeals, we have held that
limited liability companies are citizens of every state of which any member is a citizen."); *see also*
28 U.S.C. § 1332(c)(1) ("a corporation shall be deemed to be a citizen of any State by which it has
been incorporated and of the State where it has its principal place of business . . . .").

[2] According to Tweet/Garot, the installation work, as well as the purchase of the valves, was
performed by its subcontractors, Tweet/Garot Mechanical, Inc. and August Winter & Sons, Inc.
(Pl.'s Resp. to DPFOF ¶¶ 7-8, 10.)  However, owing to the policy's definition of "your work," that
distinction is not material for purposes of this motion.  (*See* discussion *infra*)

reach locations, the repair costs included the costs of tearing out portions of Lambeau Field and then repairing the torn-out areas.

Liberty Mutual had issued to Lambeau Field Redevelopment, LLC, a Comprehensive General Liability ("CGL") policy whose coverage extended to subcontractors such as Tweet/Garot. On May 26, 2005, Tweet/Garot submitted to Liberty a claim for "property damage" caused by one or more "occurrences" arising from the valves' failure. (Ex. C to Decl. of Mark M. Leitner.) The next day,[3] May 27, 2005, Tweet/Garot brought suit in the Circuit Court for Brown County against the valves' manufacturer (Star Pipe Products, Inc.), seller (Mid-State Supply, Inc.), and marketing company (E.P. Sales, Inc.), asserting breach of warranty and other claims.

On July 7, 2005, Tweet/Garot's counsel, Daniel M. Janssen, submitted to Liberty Mutual an invoice for nearly $32,000, representing repair work done by a subcontractor in July and August of 2004 to "replace defective valves at Lambeau Field." (Ex. D to Decl. of Mark M. Leitner.) On August 15, 2005, Janssen submitted two more invoices totaling nearly $333,000 for "warranty valve work" done between October 2004 and July 2005. (Ex. E to Decl. of Mark M. Leitner.) In a letter to Liberty Mutual dated February 27, 2006, Janssen repeated these amounts and also set forth a claim of approximately $200,000 for the cost of "finish[ing] repairs on Lambeau Field" (Daniel M. Janssen letter at 1, attached as Ex. F to Decl. of Mark M. Leitner), as well as roughly $45,000 in attorney fees and costs associated with litigating the state court action against the valve suppliers. (*Id.* at 2.) In this same letter, Janssen thanked Liberty Mutual for accepting Tweet/Garot's claim

_____

[3] Liberty Mutual's proposed findings of fact list May 27, 2006, as the date this suit was filed, but this appears to be a typographical error, in light of the dates given in adjacent paragraphs, and in light of the date on the state court complaint. (*See* Pl.'s PFOF ¶¶ 29-34; Decl. of Mark M. Leitner, Ex. A at 24.)

3

for over $600,000, pending final processing in Liberty Mutual's Boston office. (*Id.* at 1.) Especially significant for purposes of this motion is that the invoices submitted to Liberty Mutual reflect only the costs of repairing and replacing the valves, but do not include any costs to repair physical damage, such as water damage, to other Lambeau Field property caused by the failure of the valves.

On March 1, 2006, Liberty Mutual advised Tweet/Garot that it had retained its own counsel, Keith Kostecke, to participate in a March 2, 2006, status conference in the Brown County action and to take over prosecution in that action. Kosteke appeared in a March 3, 2006, scheduling conference on behalf of Liberty Mutual, at which he and counsel for defendants selected discovery dates and trial dates convenient to themselves. On March 20, 2006, Liberty Mutual advised Janssen that it had reversed its position and would not accept coverage for the repair claims, and would not take over the prosecution of the Brown County lawsuit. In May of 2006, several third-party defendants were impleaded into the Brown County lawsuit, and by July of 2006 all of these third-party defendants had answered and appeared in the litigation.

On June 21, 2006, Tweet/Garot filed suit against Liberty in the Circuit Court for Brown County, alleging that Liberty Mutual breached its policy to indemnify Tweet/Garot for the loss or, alternatively, is estopped from denying coverage. Tweet/Garot also alleged Liberty Mutual denied the coverage claim in bad faith. Liberty Mutual removed the action to this court, and then moved to bifurcate the bad-faith claim from the underlying coverage claim and to stay all discovery related to the former. The court granted Liberty Mutual's motion to bifurcate and stay discovery on the bad-faith claim in its Order of September 21, 2006. Liberty Mutual has now moved for summary judgment on the ground that as a matter of law the policy terms clearly do not provide coverage for

4

Tweet/Garot's claims, and that, contrary to Tweet/Garot's contention, equitable estoppel is not available here.


## II. ANALYSIS

### A. Summary Judgment Standard

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Id.* at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend its case. *Id.* at 322-24.

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion, however; there must be a *genuine* issue of *material* fact for the case to survive. *Id.* at 247-48.

"Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. A "genuine" issue of material fact requires specific and sufficient evidence that, if believed by a jury, would actually support a verdict in the nonmovant's favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249. Where the record taken as a whole could not lead a rational trier of fact to find for the

5

nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## B. Interpretation of Insurance Policies

Coverage under an insurance policy is generally a question of law, *Kremers-Urban Co. v. Amer. Employers Ins. Co.*, 351 N.W.2d 156, 163 (Wis. 1984), although occasionally insurance coverage is the subject of factual disputes that make summary judgment inappropriate. *E.g., Atlantic Mut. Ins. Cos. v. Lotz*, 384 F. Supp. 2d 1292 (E.D. Wis. 2005); *Buchholz v. Rural Cmty. Ins. Co.*, 402 F. Supp. 2d 988 (W.D. Wis. 2005). Here, Tweet/Garot challenged only three of Liberty's proposed findings of fact, and none of these has any impact on the instant motion.[4] The question of whether Tweet/Garot's claims are covered by the policy is therefore a question of law.

Under Wisconsin law, insurance policies are contracts, and so are governed by the same rules that govern the interpretation of contracts in general. *Smith v. Katz*, 595 N.W.2d. 345, 350 (Wis. 1999). The primary goal in interpreting a contract is to determine, and give effect to, the parties' intentions. *Gorton v. Hostak, Henzl & Bichler, S.C.*, 577 N.W.2d 617, 622 (Wis. 1998); *Kremers-Urban*, 351 N.W.2d at 163. If the contractual language is unambiguous, a court is to construe the contract according to its literal terms, *Gorton*, 577 N.W.2d at 623, giving the terms their plain and ordinary meaning. *Frost ex rel. Anderson v. Whitbeck*, 654 N.W.2d 225, 230 (Wis. 2002). Dictionary definitions are dispositive of the ordinary meanings ascribed to contract terms. *Gorton*, 577 N.W.2d at 623. On the other hand, if the contractual language is ambiguous, that is, if it may reasonably be construed to have more than one meaning, any ambiguity is to be construed

---

[4] *See* footnote 2 *supra*.

against the drafter. *Id.* Whether a contract is ambiguous is a question of law. *Frost*, 654 N.W.2d at 230.

When the contract at issue is an insurance policy, a court should give the words of the policy the meaning that a reasonable person in the position of the insured would have given them. *Id.* However, a court must not rewrite an insurance policy so as to provide coverage for a risk that the insurer did not contemplate and for which it has not been paid. *Smith*, 595 N.W.2d at 350 (internal quotation and citation omitted).

## C. Coverage Provisions

Under Wisconsin law, a court's first step in a coverage dispute is to "examine the fact of the insured's claim to determine whether the policy's insuring agreement makes an initial grant of coverage." *Am. Family Mut. Ins. Co. v. Am. Girl, Inc.*, 673 N.W.2d 65, 73 (Wis. 2004). If the agreement makes no initial grant of coverage, the analysis ends there; if there is an initial grant of coverage, however, the court then examines the various exclusions to see whether any of them precludes coverage. *Id.* Exclusions are strictly construed against the insurer if their effect is uncertain, and a court is to analyze each exclusion separately. *Id.*

The policy Liberty Mutual issued to Lambeau Field Redevelopment, LLC, provides coverage to the Named Insured and to Additional Named Insureds, including "all subcontractors[5] of any tier . . . for whom the First Named Insured has agreed by contract to provide General Liability coverage under the Owner Controlled Insurance Program, excluding vendors, suppliers . . . and

---

[5] Solely for purposes of this motion, Liberty assumes that Tweet/Garot qualifies as a subcontractor. (Def.'s Br. in Supp. of Mot. for Summ. J. at 5.)

7

others who merely make deliveries to or from the Project Site(s)." (DPFOF ¶ 20; Liberty Mutual Policy, Endorsement 2 at 3, attached as Ex. B to Declaration of Mark M. Leitner.) As part of obtaining the winning HVAC bid on the project, Tweet/Garot was named as an additional insured. (PPFOF ¶ 10.) The policy provides coverage for "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." (DPFOF ¶ 44.) As regards Additional Named Insureds, the policy provides coverage for property damage if it occurs at the Project Site (i.e., the Lambeau Field Redevelopment Project), arises out of the Additional Named Insured's operations at the Project Site, and is caused by an "occurrence." (*Id.* ¶ 21, 26.)

The basic grant of coverage is defined by several key terms. "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.* ¶ 22.) Central to the coverage issue is the meaning of "property damage." As relevant here, the policy defines "property damage" as either "physical injury to tangible property" or "loss of use of tangible property that has not been physically injured." (*Id.* ¶ 21.) Loss of use is not germane here, so the question becomes whether there was "physical injury to tangible property" at the project site.

Tweet/Garot argues that property damage clearly occurred in this case when the defective valves were installed in the heating and cooling systems for the Lambeau Field renovation project. In support of its argument, Tweet/Garot relies primarily upon the majority opinion rendered by the Seventh Circuit in *Eljer Mfg. Co. v. Liberty Mut. Ins. Co.*, 972 F.2d 805 (7th Cir. 1992), in which

the Court was faced with a similar issue that arose under Illinois law.[6] *Eljer* involved a company that manufactured and sold a defective plumbing system to plumbing contractors all over the United States over a seven-year period. As in this case, the repair or replacement of the system required breaking into walls, floors, or ceilings. Estimating its potential tort liability in the hundreds of millions of dollars, Eljer brought suit seeking a declaration that it was covered under a GCL policy also issued by Liberty Mutual. In that case, Liberty Mutual's policy had lapsed by the time many of the leaks had occurred, and the issue before the Seventh Circuit was when property damage occurred—at the time of the system was installed or when it began to leak.

Noting that there was no controlling precedent from the Illinois Supreme Court, the *Eljer* majority made an "*Erie* guess,"[7] predicting that the Illinois Supreme Court would hold that "physical injury to tangible property" existed when the insured's defective plumbing system was incorporated into a larger structure (i.e., installed in the home), even if the system had never leaked or manifested defects. *Id.* at 814. The court likened the defective plumbing system to a ticking time bomb, placed in an airplane luggage compartment. *Id.* at 807. Relying on the drafting history of the property-damage clause in the CGL policy and the probable understanding of the parties to liability insurance contracts, the panel majority concluded that "the incorporation of a defective product into another product inflicts physical injury in the relevant sense on the latter the moment

---

[6] *Eljer* is also cited in support of an argument Tweet/Garot makes that Liberty Mutual is liable for the costs of replacing the defective valves under general principles of loss mitigation. That argument, which I regard as separate from its argument that coverage exists under the plain terms of the policy, will be addressed below.

[7] An "*Erie* guess" is a federal court's prediction regarding how a state's highest court would rule on an issue it has not yet addressed. *See Todd v. Societe Bic, S.A.*, 21 F.3d 1402, 1416 (7th Cir. 1994).

9

of incorporation—here, the moment when the defective [plumbing] systems were installed in homes." *Id.* at 814. Tweet/Garot urges me to reach the same conclusion regarding Wisconsin law.

Of course, as Liberty Mutual points out, the Seventh Circuit's "*Erie* guess" in *Eljer* as to the future direction of Illinois law is not binding here, where the court is applying Wisconsin law.[8] Liberty Mutual also notes that the Illinois Supreme Court squarely rejected *Eljer* in a later case involving the same defective plumbing system and the same manufacturer. *See Travelers Ins. Co. v. Eljer Mfg., Inc.*, 757 N.E.2d 481, 497 (Ill. 2001) ("We believe that the *Eljer* majority erred when it set aside the 'central,' plain, and ordinary meaning of the term 'physical injury,' and instead employed an admittedly 'conjectured' analysis with respect to the function that the phrase was intended to perform in a CGL policy."). In rejecting the decision of the Seventh Circuit majority, the Illinois Supreme Court cited with approval Judge Cudahy's dissent in *Eljer*, wherein he argued that the majority's view cannot give meaning to the words "physical" and "injury" at the same time: "Something *physical* occurs when the [defective] plumbing is installed—but it is not injury; and we might say that there is *injury* (of a sort) when the [defective] plumbing is installed—but it is not physical." *Eljer*, 972 F.2d at 815 (Cudahy, J., dissenting). The Illinois Supreme Court also rejected the incorporation theory of the *Eljer* majority and instead adopted a definition of the term "physical injury" that was both positive and negative:

> We conclude that, to the average, ordinary person, tangible property suffers a "physical" injury when the property is altered in appearance, shape, color or in the

_____

[8] Although a CGL policy written in Illinois would likely differ little, if at all, from one written in Wisconsin, a federal court making an "*Erie* guess" as to the meaning of "physical injury" under Wisconsin law would seek guidance by looking to—though it would not be bound by—the precedents established by intermediate state appellate courts in Wisconsin, not Illinois. *See Primrose Operating Co. v. Nat'l Amer. Ins. Co.*, 382 F.3d 546, 565 (5th Cir. 2004).

10

other material dimension.  Conversely, to the average mind, tangible property does not experience "physical" injury if that property suffers intangible damage, such as diminution in value as a result from the failure of a component . . . to function as promised.

*Travelers Ins.*, 757 N.E.2d at 496.

Other courts have reached similar conclusions.  *See, e.g., F & H Const. v. ITT Hartford Ins. Co. of Midwest*, 118 Cal. App. 4th 364, 372, 12 Cal. Rptr. 3d 896 (2004) ("the prevailing view is that the incorporation of a defective component or product into a larger structure does not constitute property damage unless and until the defective component causes physical injury to tangible property in at least some other part of the system"); *Esicorp, Inc. v. Liberty Mut. Ins. Co.,* 266 F.3d 859, 862 (8th Cir. 2001) (defective steel pipe sections welded into pipe system not physical injury); *Federated Mut. Ins. Co. v. Concrete Units, Inc.* 363 N.W.2d 751 (1985 Minn.) (defective concrete used in construction of grain elevator not physical injury); *Aetna Cas. & Sur. Co. v. McIbs, Inc.,* 684 F.Supp. 246 (D. Nev. 1988) (improperly sized concrete blocks used in building construction not property damage).  Arguably, even the Seventh Circuit has rejected the majority opinion in *Eljer*. *See Sokol & Co. v. Atlantic Mut. Ins. Co.*, 430 F.3d 417, 422 (7th Cir. 2005) (costs to replace spoiled peanut butter packets included in cookie mix boxes held not to be property damage under CGL policy).

The Wisconsin Supreme Court had occasion to address *Eljer* in *Wisconsin Label Corp. v. Northbrook Property & Casualty Insurance Co.*, 607 N.W.2d 276 (Wis. 2000).  In *Wisconsin Label*, the plaintiff sought indemnification from its insurer for losses incurred when it mislabeled a customer's promotional products.  The insured cited *Eljer* in support of its argument that the mislabeling of its customer's promotional products constituted "property damage" within the

11

meaning of the CGL policy language. Although the Wisconsin Supreme Court concluded that the mislabeling of a customer's product did not constitute property damage within the meaning of the CGL policy, it did not explicitly reject the majority decision in *Eljer* in reaching its conclusion. Instead, the court distinguished *Eljer* by noting that "unlike the plumbing systems, the labels were not 'defective components.'" 607 N.W.2d at 285. "More importantly," the court noted, "even if putting the labels in the wrong place constituted 'defective work,' this defect could never be expected to cause 'physical injury.'" *Id.* In this case, of course, the valves installed by Tweet/Garot were defective components, and the failure of some of them has already caused damage to stadium property such as carpet, couches, seats, and drywall, although no claim for that damage is before the court. Thus, this case is factually distinguishable from *Wisconsin Label* on the same basis as *Eljer* was. Tweet/Garot argues that the Wisconsin Supreme Court's discussion of *Eljer* implies its approval of the rationale of that decision.

The fact that the Wisconsin Supreme Court chose to distinguish *Eljer* on its facts rather than address its reasoning provides a slim basis upon which to predict how that court would address the issue if directly presented with it, however. This is especially true where, as here, the supreme court of the state whose law was at issue in the case has explicitly rejected its reasoning. Moreover, the very language used by the court in *Wisconsin Label* to distinguish *Eljer* suggests that the incorporation of a defective component in a structure does not constitute "physical injury to tangible property." Implicit in the court's statement that "even if putting the labels in the wrong place constituted 'defective work,' this defect could never be expected to cause 'physical injury'" is the recognition that the "physical injury to tangible property" is not the same as incorporation of a defective component. "Physical injury" does not occur until it is "caused" by the defective

12

component. Only when (if ever) the component fails does the property of which it is a part suffer "physical injury." Until then, the most that can be said is that the value of the property containing the component is diminished as a result of the likelihood of failure and resulting damage. As to the suggestion that such diminution in the value of the property of which it is a part constitutes "physical damage to tangible property," *Wisconsin Label* is clearly to the contrary:

> We agree with these courts that diminution in value caused by incorporation of a defective product does not constitute "property damage" under post-1973 policies unless it is the result of "physical injury" or "loss of use." Any suggestion in *Sola Basic* that CGL policies provide coverage for diminution in value that is not caused by physical injury or loss of use is inconsistent with the definition of "property damage" in post-1973 policies. We therefore conclude that the Policy provides no coverage for diminution in value in the absence of physical injury or loss of use.

607 N.W.2d at 288.

It is also noteworthy that in *Wisconsin Label* the Wisconsin Supreme Court held that the phrase "physical injury to tangible property" in a CGL insurance policy is unambiguous, 607 N.W.2d at 284, and that the inclusion of the word "physical" in such a policy definition must be given meaning: "Although the term 'injury,' standing alone, may refer broadly to both physical and non-physical types of damage, when it is qualified by the word 'physical,' its meaning is limited to physical damage." *Id.* I therefore conclude that under the plain and ordinary meaning of the terms, the replacement costs of the 300-plus valves in the HV/AC system at Lambeau Field does not constitute "property damage" within the meaning of Liberty Mutual's policy. Though they were defective, all but 13 of the valves had not leaked or caused any physical damage. And while physical injury (and therefore property damage) did arise from the failure of the 13 valves replaced in the summer of 2004, Tweet/Garot acknowledges that its present claims stem only from work done to repair and replace valves, and do *not* include any costs to repair physical damage to other

13

Lambeau Field property caused by the failure of the remaining valves.[9]  In sum, I conclude that the replacement costs for defective valves do not constitute property damage under Liberty Mutual's policy.

## D.  Exclusions

Even if the replacement costs for the defective valves did constitute "property damage" within the meaning of Liberty Mutual's property, two of the policies' exclusions would operate to preclude coverage.  Exclusion (m) of the policy eliminates coverage for:

> "Property damage" to "impaired property" or property that has not been physically injured, arising out of:
> (1)  A defect, deficiency, inadequacy or dangerous condition in . . . "your work"; or
> (2)  A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.
> This exclusion does not apply to the loss of use of other property arising out of a sudden and accidental physical injury to . . . "your work" after it has been put to its intended use.

(Liberty Mutual Policy, Sec. I.A.2.m; DPFOF ¶ 26.)  "Impaired property" is defined as:

> tangible property, other than "your product" or "your work," that cannot be used or is less useful because:
> a.  It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or
> b.  You have failed to fulfill the terms of a contract or agreement;
> if such property can be restored to use by:
> a.  The repair, replacement, adjustment or removal of "your product" or "your work"; or
> b.  Your fulfilling the terms of the contract or agreement.

(Liberty Mutual Policy, Sec. V, ¶ 8.)  "Your work" includes "[w]ork or operations performed by

---

[9]The record does not reveal whether Tweet/Garot submitted a claim to Liberty Mutual for the property damage caused by the initial leak in 2004 and, if it did, whether such claim was paid.

14

you or on your behalf; and . . . [m]aterials, parts or equipment furnished in connection with such work or operations," as well as warranties and representations regarding the fitness and quality of the work. (DPFOF ¶ 23.) Under exclusion (n) of the policy, no coverage is provided for

> [d]amages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:
>
> *   *   *
>
> (2) "Your work";
>
> *   *   *
>
> if such . . . work . . . is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

(Liberty Mutual Policy, Sec. I.A.2.n; DPFOF ¶ 28.)

Exclusion (m) addresses situations where a defective product, afer being incorporated into the property of another, must be replaced or removed at great expense, thereby causing loss of use of the property. The exclusion negates coverage where Tweet/Garot's work caused damage to "impaired property"—that is, property (other than Tweet/Garot's work) that cannot be used or is less useful because it incorporates work by Tweet/Garot known or thought to be "defective, deficient, inadequate or dangerous"—so long as the usefulness of the impaired property can be restored by the repair, removal, or replacement of Tweet/Garot's work. This exclusion applies to the facts of this case in rather straightforward fashion. Tweet/Garot's "work," which includes the defective valves, caused damage to other Lambeau Field property that then could not be used or was made less useful because it incorporated the defective valves, and the usefulness of the other Lambeau Field property could be—in fact, was—restored by removing and replacing the valves.

15

Furthermore, because "your work" includes work performed "by you or on your behalf," the valve installation work performed by Tweet/Garot's subcontractors qualifies as Tweet/Garot's work. The exception for "sudden and accidental physical injury" does not apply, for the destruction of walls and other Lambeau Field property in order to replace the faulty valves was deliberate, as Tweet/Garot admits.

Tweet/Garot contends that the exclusion is ambiguous and does not apply where other property (which incorporates the allegedly faulty work or product) has been physically injured. In response, I note that the Seventh Circuit found no ambiguity in a policy using exactly the same exclusionary language. *Sokol & Co. v. Atlantic Mut. Ins. Co.*, 430 F.3d 417, 423 (7th Cir. 2005). Furthermore, although injury to other property occurred with the initial leak and replacement of the first 13 valves, Tweet/Garot has not submitted any invoices or claims for injury to other property. As to the defective 300-plus valves, prior to their removal and replacement they caused no physical injury to other property.

Exclusion (n) likewise precludes coverage. Exclusion (n) is concerned with preventive actions and anticipated losses. It is designed to exclude coverage for expenses incurred when the insured's work, believed to be defective or deficient, is either temporarily or permanently withdrawn from use so as to prevent anticipated losses arising from the defect or deficiency. *Paper Mach. Corp. v. Nelson Foundry Co., Inc.*, 323 N.W.2d 160, 163-64 (Wis. Ct. App. 1982). Tweet/Garot's claim falls squarely within exclusion (n). Its claim with respect to the 300-plus valves is for expenses associated with withdrawal from use (here, "repair" and "replacement") of that part of its work believed to suffer from the same defects as those valves that failed in 2004, so as to eliminate the risk of additional failures. Tweet/Garot argues that under existing case law the withdrawal or

16

recall of the product must be market-wide before the exclusion applies, but the clear language of the exclusion does not support such a reading. Like exclusion (m), the language of exclusion (n) is unambiguous, *see Sokol*, 430 F.3d at 424, and by its clear terms extends to circumstances where the product is withdrawn "from use by any person or organization because of a known or suspected defect." Here, Tweet/Garot, acting on orders from the Green Bay Packers and the redevelopment project's general contractor, withdrew the 300-plus valves from its work and replaced them because they were thought to be defective. As for the first 13 valves, Tweet/Garot withdrew and replaced them because it knew they had failed. These facts clearly bring Tweet/Garot's claims within the ambit of this exclusion.

**E. Loss Mitigation**

Tweet/Garot's primary argument in favor of coverage, it appears, is based not on the language of the policy, but on the principle of loss mitigation. (Resp. Br. at 11-21.) In support of its argument that Liberty Mutual is required to pay under this principle, Tweet/Garot notes that its decision to replace the defective valves before they actually failed avoided a catastrophic loss that would have created enormous liability on the part of the Green Bay Packers, Turner Construction, Liberty Mutual and Tweet/Garot. The inability to isolate portions of the heating and air conditioning system before a Green Bay Packers home NFL football game, Tweet/Garot argues, could have been disastrous. If an external leak in the system occurred and could not be isolated because of the defective valves, a possibility existed that thousands of gallons of propylene glycol solution would spill onto the indoor spaces of Lambeau Field, contaminating luxury boxes, locker rooms, restaurants, retail space, and corridors in and around Lambeau Field. (TGAW ¶ 28.) Failure

17

of the valves could also cause a failure of the entire heating system during a winter home game. (*Id.* ¶ 29.) Ultimately, according to Tweet/Garot, failure of the valves could cause the cancellation of a Green Bay Packers home game, an event that would result in enormous liability, requiring consideration of a number of factors including:

> (1) the cost of tens of thousands of football tickets, (2) the cost of hundreds of thousands in lost revenue from merchandise and concession sales, (3) tens of millions in lost television and sponsorship revenue, (4) tens of millions that would be incurred to reschedule an NFL football game, if in fact it were possible to do so, and (5) the incalculable cost of loss of goodwill that would be suffered by the Packers, the opponent of the Packers and the National Football League.

(Resp. Br. at 6-7.) Tweet/Garot contends that it avoided this loss by replacing the defective valves at a cost of slightly over $600,000. Of this amount, only about $63,000 was attributable to the cost of the faulty valves and couplings. The remainder was spent on labor and materials necessary to remove and replace the valves, including tearing out walls and ceilings to reach the valves , and then repairing the torn out areas. (TGAW ¶ 35.) Under general principles of loss mitigation, Tweet/Garot contends it is entitled to reimbursement for these expenses from its insurer, regardless of the express terms of its policy. (Resp. at 13.)

Tweet/Garot's argument that by proceeding to replace the defective valves it installed in the Lambeau Field heating and air conditioning system, it avoided a potentially larger loss, much of which would have been covered under the policy of insurance issued by Liberty Mutual, has some support in the record. Unfortunately, the authority Tweet/Garot cites in support of its argument does not support the broad principle it seeks to apply. Tweet/Garot quotes extensively from a treatise on insurance law, 12 Couch on Insurance 3d § 178:10 (1995 & Supp. June, 2006), but the section from which it quotes deals primarily with property and casualty insurance, as opposed to the kind of

18

liability policy at issue here.  *Id.* at § 178:9, pg. 178-16 ("The discussion which follows addresses the recovery of particular consequential damages which pertain to loss or damage under a property insurance policy.").  Because the property insured under such policies is owned by the insured, the insured is often in a position to mitigate the loss and generally is required to do so under the terms of the policy.  *See, e.g., Wichter Constr. Co. v. St. Paul Fire & Marine Ins. Co.*, 550 N.W.2d 1, 7 (Minn. App. 1996) ("policy requires [insured] to 'do everything possible to protect the property from further damage' upon the occurrence of a covered loss and promises to reimburse [insured] for the insurer's share of such expenses").  Where a duty to mitigate the loss exists under the policy, courts construe the policy to require payment of the expenses incurred in mitigation even if the policy does not expressly provide for payment of such expenses.  *Slay Warehousing Co., Inc. v. Reliance Ins. Co.*, 471 F.2d 1364,1367-68 (8th Cir. 1973); *City Coal & Supply Co. v. Amer. Auto Ins. Co.*, 133 N.E.2d 415 (Ohio App. 1954).  Tweet/Garot has pointed to no such provision in Liberty Mutual's policy.

Although Tweet/Garot also cites cases involving liability policies that do not contain mitigation provisions, in each of the cases it cites a covered loss was in progress when the expenses to mitigate the loss were incurred.  Thus, in *Watts Industries, Inc. v. Zurich American Insurance Co.*, 121 Cal. App. 4th 1029, 18 Cal. Rpt. 3d 61 (Cal. App. Dist. 2d 2004), the court held that the insurer had a duty to defend its insured in a lawsuit by various municipalities seeking costs of replacing metal parts manufactured by the insured that were used in municipal water systems where the complaint alleged that the parts were causing ongoing lead contamination.  Noting that "[c]osts incurred strictly for prophylactic purposes are neither incurred because of property damage nor covered by CGL policies," 18 Cal. Rpt. 3d at 68, the court concluded that the costs sought in the suit were not merely prophylactic:

19

> In requesting costs for replacement of Jones's parts and for water quality monitoring, the municipalities seek court-ordered monetary payments due to alleged harm caused by Watts and Jones. Whether these payments are viewed as traditional damages or as reimbursement of government response costs, they constitute "damages" under *AIU* [*Ins. Co. v. Superior Court,* 51 Cal. 3d 807, 821-22, 274 Cal. Rptr. 820, 799 P.2d 1253 (1990)]. Since the municipalities allege that lead contamination is ongoing, the requested remedies are necessarily at least partly remedial and mitigative, rather than entirely prophylactic, for they address harm which is already occurring, not just harm that might occur.

*Watts Indus., Inc.*, 18 Cal. Rpt. 3d at 68. Likewise, in *Goodyear Rubber & Supply, Inc. v. Great American Insurance Co.*, 545 F.2d 95 (9th Cir. 1976), the court held that a policy requiring the insurer "[t]o pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of property damage caused by an occurrence" included coverage for the costs of a salvage operation for a barge that caught fire as a result of a leak in a rubber hose sold by the insured. There, as in *Watts Industries*, the covered loss was in progress at the time the expenses to minimize the extent of loss were expended. Here, by contrast, the only insured loss had occurred more than a year before Tweet/Garot embarked on an effort to replace the remaining valves, even though none had of them had failed. The leaking that had occurred when the first 13 valves failed had been stopped, and there was no continuation of an insured loss when the replacement costs were incurred. In this respect, as well as in the coverage language of the policies at issue, this case is distinguishable from those Tweet/Garot cites in support of its argument that its replacement costs are covered.

This case also differs from those cited by Tweet/Garot in support of its argument for coverage under principles of loss mitigation in that the costs Tweet/Garot seeks to recover are expressly excluded by the policy. None of the cases cited by Tweet/Garot in support of its argument address policies containing exclusions such as the "impaired property" or the "product recall"

20

exclusions discussed above. To construe a policy to provide such coverage in the face of language expressly excluding replacement costs for deficient or defective work or products would contradict the fundamental rule that a court "must not rewrite an insurance policy so as to provide coverage for a risk that the insurer did not contemplate and for which it has not been paid." *Amer. Family Mut. Ins. Co. v. Amer. Girl, Inc.*, 673 N.W.2d at 73. Absent any Wisconsin precedent for reading such coverage into an insurance policy, it would be improper for this court to do so. "[F]ederal court is not the place to press innovative theories of state law." *Anderson v. Marathon Petroleum Co.*, 801 F.2d 936, 942 (7th Cir. 1986). The important public policy arguments advanced by Tweet/Garot in support of its argument are better addressed by a legislative or administrative body with the resources and mandate to enact law or promulgate regulations in the public interest upon consideration of all potential consequences of such a rule, including the unintended consequences that inevitably arise.

**F. Attorneys Fees**

Tweet/Garot also claims that the legal costs incurred in pursuing its state court claim against the valve suppliers are covered by the policy. Under the policy, Liberty has the duty to defend against any suit seeking covered damages. However, no suit has been filed against Tweet/Garot, and thus Liberty's duty to defend has not been triggered. The policy does not impose upon Liberty any duty to pursue Tweet/Garot's affirmative claims against other parties from whom Tweet/Garot claims a right to compensation. *See Towne Realty, Inc., v. Zurich Ins. Co.*, 548 N.W.2d 64, 68-69 (Wis. 1996).

21

### G. Equitable Estoppel

Lastly, Tweet/Garot contends that Liberty is estopped from denying coverage by virtue of its initial acceptance of coverage and its appearance in a separate state court action against the valve suppliers. A party is estopped from asserting a claim or defense if it acts in such a way as to induce another to act (or refrain from acting) in detrimental reliance. *Heideman v. Amer. Fam. Ins. Group*, 473 N.W.2d 14, 19 (Wis. Ct. App. 1991). Under Wisconsin law, the general rule is that waiver or estoppel may not be used to create insurance coverage where none existed. *Shannon v. Shannon*, 442 N.W.2d 25, 33 (Wis. 1989). Wisconsin courts have consistently followed this rule since it was laid down in the state over 100 years ago in *McCoy v. Northwestern Mutual Relief Association*, 66 N.W. 697, 699 (Wis. 1896). *E.g., Ahnapee & W. Ry. Co. v. Challoner*, 148 N.W.2d 646, 650 (Wis. 1967); *Budget Rent-A-Car Sys., Inc. v. Shelby Ins. Group*, 541 N.W.2d 178, 181 (Wis. Ct. App. 1995).

Two exceptions to the general rule are potentially relevant.[10] First, an insurer may be estopped from later denying coverage when it assumed the insured's defense in the underlying litigation without a reservation of rights. *See, e.g., City of Carter Lake v. Aetna Cas. & Sur. Co.*, 604 F.2d 1052, 1059 (8th Cir. 1979); *Pacific Indem. Co. v. Acel Delivery Serv., Inc.*, 485 F.2d 1169, 1173 (5th Cir. 1973). The rationale for this exception is simple: when an insured surrenders the right to control its own defense without the knowledge that its insurer might later deny coverage,

---

[10] Other exceptions to the general rule may arise in situations involving policy cancellation and forfeiture of coverage, but these exceptions are not implicated by the facts of this case. *See, e.g., Peterson v. Truck Ins. Exchange*, 223 N.W.2d 579, 583-84 (1974) (insurance company might have waived its right to rely on lapse clause, which was automatically triggered by non-payment, by acting inconsistently with that clause); *Nugent v. Slaght*, 638 N.W.2d 594, 599-602 (Wis. Ct. App. 2001) (discussing general rule and its exceptions and concluding insurer could be estopped from asserting cancellation defense).

22

the insured becomes vulnerable to exploitation through a strategy in which the insurer uses its exclusive control of the defense to direct the litigation away from coverage under the policy.

Tweet/Garot argues there is no valid reason to limit the doctrine of estoppel to cases involving a duty to defend. However, Tweet/Garot has cited no case in which a court has extended the doctrine of estoppel to bar coverage defenses after the insurer appears in an underlying litigation on its own behalf to prosecute a subrogation claim against a third party, then determines it is not in fact obligated to pay the insured and accordingly has no subrogation claim to pursue. Nor has the court unearthed any such precedent. The lack of precedent is understandable, for in such circumstances, the insured is not vulnerable to losing its insurance coverage. Keeping in mind that federal courts sitting in diversity must apply state law as it exists, and with no precedent or cogent reason offered for extending the doctrine, this court declines to make the leap Tweet/Garot recommends, especially in light of Tweet/Garot's failure to show it was prejudiced by Liberty's withdrawal from the state court action against the valve suppliers.

Tweet/Garot avers that it has been prejudiced by agreeing to trial dates falling later than it would have liked in the state court action. But as Liberty points out, Tweet/Garot has not explained whether it would have been entitled to an earlier trial date, given the undisputed fact that one of the defendants in that suit impleaded other parties. Nor has Tweet/Garot provided any information about the current status of that suit to support its contention that even after the third parties were joined, it still would have been given an early trial date. Under Wisconsin law, proof of detrimental reliance is required rather than presumed, *Ryder v. State Farm Mut. Auto. Ins. Co.*, 187 N.W.2d 176, 180 (Wis. 1971), and it may not rest on mere inference or conjecture. *Gonzalez v. Teskey*, 465 N.W.2d 525, 530 (Wis. Ct. App. 1990). The alleged detriment must also be actual and substantial,

23

and not merely technical or formal. *Nugent v. Slaght*, 638 N.W.2d 594, 603 (Wis. Ct. App. 2001) (internal citation omitted). Tweet/Garot's mere assertion that it has suffered prejudice from Liberty's role in securing the later trial dates falls well short of meeting this burden.

Similarly unpersuasive is Tweet/Garot's argument that Liberty's initial acceptance of Tweet/Garot's claim should estop Liberty from denying coverage now. Liberty's initial acceptance of coverage was conditioned on approval by its Boston office, and Tweet/Garot's later correspondence clearly indicates Tweet/Garot was aware of same. (Daniel M. Janssen letter at 2, attached as Ex. F to Decl. of Mark M. Leitner.)

A second exception to the general rule that estoppel may not be used to create insurance coverage arises when an insurer wrongfully refuses to defend its insured on the ground that a third party's claim is not within the policy coverage. In such a situation, the insured cannot later contest coverage, but is held liable to the insured.[11] *Radke v. Fireman's Fund Ins. Co.*, 577 N.W.2d 366, 371 (Wis. Ct. App. 1998). This exception does not help Tweet/Garot, for it applies only in the wake of an insurer's breach of its duty to defend. Tweet/Garot's complaint does not allege that Liberty breached—much less even had—a duty to defend.

## CONCLUSION

For the reasons set forth above, the court concludes as a matter of law that Tweet/Garot's claims do not come under the issuing agreement of the policy. Furthermore, even if there had been

---

[11] Although this result is usually classified as a waiver of the right to contest coverage, *Radke*, 577 N.W.2d at 371, it has been held that the insurer, owing to its wrongful failure to defend, is estopped from challenging coverage. *E.g., Prof'l Office Bldgs., Inc. v. Royal Indem. Co.*, 427 N.W.2d 427, 431 (Wis. Ct. App. 1988).

24

an initial grant of coverage in the issuing agreement, coverage would be precluded by exclusions (m) and (n). Given the clear language of the policy, it would be improper for the court to impose coverage under principles of loss mitigation. Lastly, the doctrine of equitable estoppel is not available here to Tweet/Garot to bar Liberty's denial of coverage for the claims submitted. Accordingly, Liberty Mutual owes no duty to indemnify Tweet/Garot for the costs of replacing the defective valves installed in the Lambeau Field renovation project. As a consequence, it also follows that Liberty Mutual did not act in bad faith in denying Tweet/Garot's claim, for where there is no insurance coverage, there can be no bad-faith claim.

**IT IS THEREFORE ORDERED** that defendant's motion for summary judgment is granted, and that plaintiff's claims, including its claims of bad faith and estoppel, are dismissed with prejudice.

**IT IS FURTHER ORDERED** that a declaratory judgment be entered that defendant's policy does not provide coverage for the claims plaintiff submitted pursuant to this action.

Dated this _____7th_____ day of February, 2007.

         s/ William C. Griesbach
        William C. Griesbach
        United States District Judge

25